[Cite as *Dane Subdivision, Inc. v. Zimmer*, 2014-Ohio-4968.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
OTTAWA COUNTY

Dane Subdivision, Inc.                                    Court of Appeals No. OT-13-033

    Appellant                                              Trial Court No. 10CV488H

v.

Paul E. Zimmer, et al.                                    **DECISION AND JUDGMENT**

    Appellees                                              Decided:  November 7, 2014

* * * * *

David P. Bertsch, for appellant.

Richard R. Gillum, for appellees.

* * * * *

**JENSEN, J.**

{¶ 1} Following a bench trial, plaintiff-appellant, Dane Subdivision, Inc. ("Dane"), appeals the September 17, 2013 judgment of the Ottawa County Court of Common Pleas which determined the rights of Dane and defendants-appellees, Paul Zimmer ("Zimmer") and Patricia Zimmer, in a number of properties located in the Danevang Subdivision

No. 2 in Ottawa County, Ohio. For the reasons that follow, we affirm the trial court's judgment, in part, and reverse, in part.

## I. Background

### A. The Properties and the Dispute

{¶ 2} This dispute is over the parties' rights to property located along the Lake Erie shore in Catawba Island Township, Ottawa County, Ohio. There are essentially four properties at issue: (1) Lots 22 and 23 in Danevang Subdivision 2, currently owned by the Zimmers; (2) a boat basin owned by Dane and its east wall, which runs along the westerly edge of the Zimmers' property; (3) a gravel path between the east wall of the boat basin and the Zimmers' lots which provides the only means to access the boat basin; and (4) a turnaround area on Dane Avenue, a private roadway owned by Dane, which the Zimmers are permitted to use.

{¶ 3} Danevang Subdivision 2 encompasses all the properties pertinent to the parties' claims. Arne and Kirsten Rasmussen at one time owned all the properties at issue. In May of 1977, the Rasmussens sold Lots 22 and 23 to John and Margaret Kolesar subject to an "eight (8.0) foot right of way along the westerly lot line of Lot No. 22 for use of the boat harbor shown as existing slip." They retained a right of first refusal in the event the Kolesars elected to sell the lots.

{¶ 4} In July of 1979, the Rasmussens transferred to Lloyd Beam and Leotis Masters, Sr. its rights in the dock areas in the Danevang Subdivision 2, along with "an easement for the use in common with the grantors [i.e., the Rasmussens], of all their

2.

rights of way leading from the dockage and boat basin areas" to the main channel of West Harbor. No mention is made in the deed of any right of first refusal to purchase the Kolesars' lots. In August of 1979, Beams and Masters deeded the property to Dane.

{¶ 5} The east wall of the boat basin, originally constructed of wood railroad ties, was replaced by Dane in 1981. Dane installed a steel wall made of guardrails secured with metal tie rods. It welded ramps to the guardrails which are lifted out of the water after boating season. Those ramps lead down to floating docks which are also removed. Before the wall was replaced, there was a dirt path that ran adjacent to the wall. When it installed the new wall, Dane laid gravel along the path. As the gravel dissipates or holes form in the ground, Dane refills it as needed.

{¶ 6} Dane property association members use the path to access their boats and sometimes travel the path in golf carts to transport equipment. Dane owns a tractor which is used to lift and lower the docks at the beginning and end of the boating season, and that tractor is driven along the path. Disputes sometimes arose with the Kolesars when members veered off the path and onto the Kolesars' yard. At one point, Mr. Kolesar laid boulders down to demarcate the line between his yard and the eight-foot pathway extending out from the east wall.

{¶ 7} In August of 2006, the Kolesars sold Lots 22 and 23 to the Zimmers subject to the restrictions, conditions, and easements described in the Kolesars' deed. In 2010, the Zimmers had the land surveyed and discovered that the property line actually extended into the boat basin. This meant that Dane's eight-foot right-of-way, as

3.

measured from the lot line, was actually submerged. The Zimmers demanded that Dane remove the ramps and floating docks.

## B. Dane Files Suit

{¶ 8} Dane filed a complaint in the Ottawa County Court of Common Pleas on July 16, 2010, which it amended on April 4, 2011, seeking injunctive relief to prevent the Zimmers from interfering with its use and enjoyment of its easement, seeking a declaration that by adverse possession, Dane had become the lawful owner of the east wall and gravel pathway, and alleging that it had a right of first refusal that was violated when the Kolesars sold their property to the Zimmers.

{¶ 9} The Zimmers answered and counterclaimed, seeking a declaration that Dane is obligated to pay "its fair share" of maintaining the easement, including contributing toward a new wall in the boat basin, estimated to cost $86,600, which the Zimmers claim is in need of immediate replacement. The Zimmers also claimed that Dane interfered with their rights to use the Dane Avenue turnaround area by storing boats, trailers, and other property along the side of the road. They claimed that Dane caused drivers to trespass onto their adjacent property by impeding the turnaround area.

{¶ 10} The parties tried their claims to the court on October 8, 2012, and submitted proposed findings of fact and conclusions of law. George Jacin, the vice-president of Dane's property owners' association, testified, as did Zimmer and William Kuckelheim, a member of the association. The deposition testimony of Eileen Gunn, the Kolesars' daughter, and Daniel Neff, an engineer hired by the Zimmers to render

4.

opinions about the condition of the east wall, was submitted in lieu of their live testimony at trial. These witnesses provided information concerning the scope of Dane's use of the pathway, the work performed to the wall, the history of disputes between Dane, the Kolesars, and the Zimmers, the parties' understanding of the property lines, the current condition of the wall, and the use of the Dane Avenue turnaround. Dane sought to establish that it not only enjoyed an easement over the wall and the eight-foot wide path, but had also gained ownership by adverse possession of a wider area of land. The Zimmers refuted that contention and sought to require Dane to share in the expense of replacing the east dock wall and to refrain from storing property along Dane Avenue.

### 1. George Jacin

{¶ 11} Jacin testified that he is the current vice-president of Dane's property owners' association and the custodian of its records. He began coming to the Dane subdivision around 17 years ago. Although he conceded that he has no personal knowledge of the construction of the retaining wall and maintenance of the pathway for the first several years of Dane's use of them, he reviewed the association's documents and testified concerning the work performed by Dane. He said that the wall had been painted, some of the tiebacks were re-welded onto poles, and the ramps, which are welded permanently to the wall, are painted every year and maintained. Dane has dredged the basin twice. He said that using a tractor, Dane puts gravel down, lifts the ramps, disconnects the floating posts of the docks, and moves the docks onto shore for

5.

the wintertime. He said that the pathway has been maintained primarily by putting gravel on it every couple of years.

{¶ 12} Jacin testified that although there had been references to the pathway being eight-feet wide, the gravel on the path usually measured somewhere between ten and 12 feet wide. There is no longer an area of demarcation between the gravel path and the Zimmers' property, however, because Zimmer graveled the entire area. Jacin explained that the association purchased a tractor in 2002 or 2003 which replaced an older, smaller tractor. He approximated that the wheel base of the new tractor is around seven-feet wide. They usually drive the tractor a couple feet from the wall, thereby using at least a ten-foot wide area. Additionally, the tiebacks attached to the guardrail wall extend approximately ten feet out.

{¶ 13} Jacin described that association members, particularly older members, sometimes drive golf carts on the gravel path along the wall to transport items to their boats. He said that they do not park on the path because they do not want to block others' access to their boats. Jacin himself never received complaints from the Zimmers about tire tracks from the golf carts appearing on their property but is aware that Zimmer had complained to others of tire marks.

{¶ 14} Jacin's first conversation with Zimmer occurred while Jacin was assisting in removing the docks. Zimmer told them to remove the ramps and the docks by the following week or he would cut them off and let them float away. The next time Jacin encountered Zimmer, Dane members were drilling holes in the wall so that they could

6.

use a winch to remove the docks and avoid using the tractor. Jacin said they decided to use the winch to maintain peace with the Zimmers, however, Zimmer told them that they should not be drilling holes in his wall and told them to leave. The sheriff was called and the Dane members decided that they would wait and talk to their attorney to try to work things out with the Zimmers. Zimmer threatened to block the pathway so that Dane members could not get to their boats. Zimmer told Jacin that he was going to "play around until [Dane's] little fund ran out of money."

{¶ 15} On cross-examination Jacin confirmed that Dane's position was that it had expanded the eight-foot right-of-way. He recognized that the new plat suggested that its eight-foot right-of-way is actually in the water. Jacin said that before the dispute with the Zimmers arose, he and other association members believed that the gravel area was actually Dane's property. He claimed that no one had ever said that it was an "easement" and he never looked at the deeds. He does not believe there is anything in the association's minutes one way or the other about whether Dane owned the property.

{¶ 16} With respect to the Dane Avenue turnaround area, Jacin testified that the area is approximately 100 feet wide. He said that the Zimmers had never complained to him or to anybody else in the association that they were unable to turn around because of the boats stored along the perimeter. He denied that those boats and the other property stored along the turnabout impeded its use. He has heard that Zimmer has made complaints about people driving onto his property while making turns in the turnaround

7.

area, but he claimed that the Zimmers or their guests sometimes parked vehicles or stored things in a manner that blocked the roadway.

{¶ 17} Regarding the claimed right of first refusal to purchase the Zimmers' property, Jacin said that the deed from the Rasmussens to the Kolesars reserved the right of first refusal to the Rasmussens. He explained that Dane's position is that there was a purchase agreement where the Rasmussens signed over those rights to Dane. He conceded that it did not appear that the purchase agreement had been recorded. He also acknowledged that none of the deeds from the Rasmussens to Dane contained language reserving that right. He believes that if the Rasmussens released the right, they did so unintentionally.

## 2. William Kuckelheim

{¶ 18} Kuckelheim, another Dane homeowners' association member, testified. He first bought property in the subdivision in 1978. When he purchased there, the wall was wood and there was a path along the wall that he used to access his dock. He helped maintain the pathway after the new wall was installed in 1981 by putting in limestone, filling in pockets where spots were sagging. He estimated doing this a couple of times a year. He described transporting five-gallon buckets of limestone by golf cart.

{¶ 19} Kuckelheim also operated the tractor owned by Dane. He said he was able to keep it within eight feet of the wall, but he approximated that the path was as wide as ten feet because that is how far back the tiebacks reached. Kuckelheim testified that the

8.

Kolesars never used the path or the wall and never told them that they were intruding onto his property.

### 3. Eileen Gunn

{¶ 20} Gunn testified that her parents acquired the Dane property in 1976 from the Rasmussens. She recalls the path being along where the neighbors stored their boats. She said there was always a "differential" between the path and their lawn, although she could not recall whether it was always a gravel path. She indicated that they knew the neighbors had an easement but there was always a dispute about them veering onto her father's lawn. She described that Dane association members would roll hand carts carrying their coolers and fishing equipment and later hauled their equipment in golf carts, oftentimes leaving tire marks on the grass. Her father got a boulder that he put at the edge of the path to mark the line between the path and the lawn. Often someone would move it, usually a foot or two, and he would move it back.

{¶ 21} Gunn recalled that her father would get annoyed because he felt they were encroaching onto his property line. She observed that her father believed the property line to be between the grass and the path. She never witnessed any arguments, though she knew some took place. She described that the area near the path was not an area of high activity for her family because they docked their boat elsewhere. When they sold the property to the Zimmers, she does not recall whether they discussed any restrictions.

9.

## 4. Paul Zimmer

{¶ 22} Zimmer testified that he met Kolesar in the late 1980s or early 1990s after Zimmer purchased his mother-in-law's property at nearby Orchard Isle. He testified that he witnessed disputes between Kolesar and Don Martin, the former Dane homeowners' association president, and other association members. He said Kolesar would yell at them for parking their golf carts on the path or leaving behind various items. He said they also used to argue over a stone pile at the end of Dane Avenue. Kolesar marked the line between his property and the right-of-way with three boulders. People would move them and Kolesar would move them back. Zimmer claims to have seen Kolesar dispute the location of the boulders.

{¶ 23} Zimmer reviewed the warranty deed from the Kolesars that referred to the eight-foot right-of-way. He described that he purchased the property in 2006 and later had the property surveyed. He discovered that the right-of-way was actually in the water. He contacted Martin and he claimed that Martin already knew that the right-of-way was submerged. He said Martin referred to the right-of-way as an "easement." He said that before he purchased the property, Martin told him that the easement was along the pathway where the docks were and Zimmer made no objection because he did not know exactly where the property lines were. Zimmer ultimately put gravel in. He denies that there had ever been a clear line demarcating the pathway—the gravel sometimes spread out into the grass. At one point, stakes were placed along the path but he does not know

10.

who put them there, their distance from the wall, or whether they were placed there to demarcate the point where the path began.

{¶ 24} The Zimmers initially allowed association members to use the property. Zimmer described that they would drive their golf carts, kids would come down, and people walked their dogs. This did not bother the Zimmers because they were not using the property. But after having the survey done in 2010, he met with Martin and told him he wanted a release signed, to protect him against liability if someone was injured. Martin refused. On cross-examination, Zimmer conceded that the release he presented to Martin also indicated that Dane could use the dock and path for that year only and that after that, the Zimmers could withdraw their permission.

{¶ 25} On cross-examination, Dane's counsel confronted Zimmer with his deposition testimony where he indicated that because of Dane's easement, he assumed that his property line stopped where the golf cart line started. Zimmer also acknowledged that Martin told him that Dane's rights extended eight to nine feet from the wall. He conceded that there had *never* been any discussion about who had rights to the wall itself and that the dispute was merely over how far the gravel pathway extended. He also conceded that he had never measured to determine how far out the gravel extended from the wall.

{¶ 26} Zimmer claimed that he has fixed over a dozen holes where the gravel needed to be replaced. He said holes pop back up every couple of months. He also testified that he obtained an estimate of $86,600 to replace the wall.

11.

**{¶ 27}** Finally, Zimmer acknowledged that when he purchased the property, he was notified of the Rasmussens' right of first refusal. However, Dane never raised the issue of a right of first refusal until this lawsuit. As to the turnaround, Zimmer indicated that association members stored property along the turnaround all year long, including boat docks, trailers, boats, and wood piles.

### 5. Daniel Neff

**{¶ 28}** Neff is a civil engineer employed with Neff & Associates. He described that the purpose of a seawall is to establish a vertical wall to separate soil and earth from waterways and to provide shoreline access. He explained that "useful life" refers to the life expectancy of a product before structural failure. In Neff's opinion, the wall is at the end of its useful life and should be replaced.

**{¶ 29}** Neff described how seawalls are constructed. He said that they are usually constructed of either interlocking steel sheet piling or interlocking reinforced concrete panel sheet piling. Because it can withstand freezing, thawing, and movement, metal is more commonly used in this part of the country. Neff said that the guardrail construction used by Dane is not an acceptable design or fabric for a seawall. He explained that it will not stop water migration. He reviewed a number of photos which demonstrate the problems he sees with the wall. He said that the gravel along the wall is being pushed down under the guardrail. Neff described that he is concerned because only the posts—and not the guardrails themselves—were driven into the ground, the guardrails are separating, rust will eventually form on the non-galvanized metal rods used as deadmen, and there is

12.

evidence of horizontal and vertical movement of the walls. His recommendation is to replace the wall with interlocking steel sheet pile.

{¶ 30} Neff conceded that he does not know whether failure of the wall will cause damage to the Zimmers' property. He also conceded that the most likely spot for failure is the south wall—not the east wall.

## C. The Trial Court's Judgment

{¶ 31} In a decision dated September 17, 2013, the court found that Dane's use of the path had been open, notorious, adverse to the Zimmers' property rights, and continuous for 21 years, but it found that Dane's use had not been exclusive. It denied Dane's adverse possession claim but found that an eight-foot prescriptive easement had been established along the gravel path for ingress and egress only. It found that although a right of first refusal was reserved by the Rasmussens when it transferred Lots 22 and 23 to the Kolesars, this right was not assigned to Dane when the Rasmussens sold the remaining property in Danevang Subdivision 2. It observed that the right was referenced in the purchase agreements, but was not recorded with the county recorder. It apportioned the expenses of installing a new wall: 25 percent to be paid by Dane and 75 percent by the Zimmers. The court also acknowledged that the Zimmers had a right to use Dane Avenue as a turnaround and enjoined Dane from blocking it or interfering with the Zimmers' use of it.

13.

{¶ 32} Dane timely appealed and assigns the following errors for our review:

1. The Trial Court Erred To The Prejudice Of Plaintiff In Holding That Plaintiff Was Not Entitled To Adverse Possession Of The Dock Wall Which Plaintiff Installed In Its Boat Basin Where The Undisputed Evidence Established Plaintiff's Continuous, Open, Notorious, Adverse And Exclusive Maintenance And Use Of The Wall Over The Past Thirty Years.

2. The Trial Court Erred To The Prejudice Of Plaintiff In Authorizing Defendant To Replace Plaintiff's Dock Wall With 25% Of The Cost Assessed To Plaintiff Without Plaintiff's Having Any Say With Respect To Replacement Procedures Or Costs Even Though The Wall Is Still In Useful Condition.

3. The Trial Court Erred To [The] Prejudice Of Plaintiff In Failing To Set Forth Plaintiff's Permissible Uses Of The Gravel Path For Which It Has An Easement For Access To Its Dock Area.

4. The Trial Court Erred To The Prejudice Of Plaintiff To The Extent It May Have Insinuated That Defendant's Implied Easement For Use Of Plaintiff's Private Road And Turnaround Extended Beyond The Traveled Portion Of The Roadway And A Reasonable Turnaround Area.

## II. Law and Analysis

{¶ 33} Dane specifically declined to assign error in the trial court's decision denying its claim of adverse possession of the eight-foot wide gravel pathway running

along the dock wall, and it did not assign error in the trial court's conclusion that no right of first refusal was granted to Dane. Dane's assignments of error pertain to the trial court's failure to find that Dane had taken ownership by adverse possession of the east dock wall, its order allowing the Zimmers to control when and how repairs are made to the wall and apportioning expenses to Dane, its failure to clarify the scope of Dane's easement over the gravel path, and its insinuation that Dane may no longer store boats and other property on the periphery of the Dane Avenue turnabout.

## A. Ownership of the Dock Wall

{¶ 34} The trial court found that Dane's use of the gravel path had been open, notorious, adverse to the Zimmers' rights, and continuous for 21 years, but that its use of the path had not been exclusive. For this reason, it denied Dane's claim for adverse possession of the path and found instead that Dane had acquired a prescriptive easement over it. The court did not, however, specifically address Dane's claim of adverse possession respecting the east wall. It determined—without explanation—that both Dane and the Zimmers use the wall, it apportioned expenses to require Dane to contribute 25 percent toward the cost of repairing the wall, and it gave the Zimmers control over scheduling and arranging the repair of the wall, except to say that repair or replacement of the wall could not commence during boating season. It is not clear whether the trial court assumed the east wall to be part of the easement, part of the lot line, part of the boat harbor, or something different altogether. In any event, in its first assignment of error,

15.

Dane assigns error in the trial court's failure to find that it acquired ownership of the wall by adverse possession.

{¶ 35} "To acquire title by adverse possession, the party claiming title must show exclusive possession and open, notorious, continuous, and adverse use for a period of twenty-one years." (Citations omitted.) *Grace v. Koch,* 81 Ohio St.3d 577, 579, 692 N.E.2d 1009 (1998). Because a successful adverse possession action divests a legal titleholder from his or her ownership interest, the doctrine is disfavored. *Id.* at 580. Accordingly, the required elements are applied stringently and each must be proven by clear and convincing evidence. *Id.*

{¶ 36} Possession is "open" if the use of the disputed property is not concealed. *Roll v. Bacon,* 160 Ohio Misc.2d 23, 2010-Ohio-5540, 938 N.E.2d 85, ¶ 33 (C.P.). It is "notorious" if its use is "known to some who might reasonably be expected to communicate [his] knowledge to the owner * * * [or] so patent that the true owner of the property could not be deceived as to the property's use." *Id.* at ¶ 34, quoting *Franklin v. Massillon Homes, II, LLC,* 184 Ohio App.3d 455, 2009-Ohio-5487, 921 N.E.2d 314, ¶ 25 (5th Dist.); *Welch v. Marlow,* 5th Dist. Morgan No. 08CA8, 2009-Ohio-6145, ¶ 26. To be "continuous" and "exclusive," all persons need not be excluded from entering upon and using the premises, however, neither the true owner nor third-persons entering onto the land may claim a right to possession. *Id.* at ¶ 35. "Adversity" requires a showing of an objective intent to possess the property and to treat it as his or her own. *Evanich v. Bridge,* 119 Ohio St.3d 260, 2008-Ohio-3820, 893 N.E.2d 481, ¶ 13. No inquiry is made

16.

of the adverse possessor's motive or purpose, however, if "the use is either by permission or accommodation for the owner, then it is not adverse." *Coleman v. Penndel Co.,* 123 Ohio App.3d 125, 130, 703 N.E.2d 821 (7th Dist.1997). Finally, these requirements must be shown to have continued over a 21-year period. *Roll* at ¶ 38.

{¶ 37} "Typically, appeals on adverse possession claims challenge the manifest weight of the evidence supporting the various elements of adverse possession." *Violante v. Vill. of Brady Lake*, 11th Dist. Portage No. 2012-P-0054, 2012-Ohio-6220, ¶ 69, quoting *Pottmeyer v. Douglas,* 4th Dist. No. 10CA7, 2010-Ohio-5293, ¶ 21. In considering a manifest weight challenge, a reviewing court weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created a manifest miscarriage of justice warranting reversal and a new trial. (Citations omitted.) *Eastley v. Volkman*, 132 Ohio St. 3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact," and where the evidence is susceptible of more than one construction, the appeals court must interpret it in a manner which is "consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." *Id*. at ¶ 21.

{¶ 38} We agree with Dane that there is no evidence in the record to support the trial court's conclusion that the Zimmers, or the Kolesars before them, used the wall. Neither the Zimmers nor the Kolesars docked their boats there and Gunn testified that her father—who owned the property until 2006—treated the line between the lawn and the

17.

gravel as the edge of his property. The evidence was that Dane property association members alone built and maintained the wall, installed and removed the ramps and docks, and docked their boats there. There simply was no evidence offered to support a conclusion that Dane's use of the wall was anything other than exclusive. Zimmer acknowledged as much at trial when he agreed that there was never any question that Dane had the rights to the wall. So to the extent the trial court found that the wall was shared and not exclusively used by Dane, we find that the evidence does not support that conclusion.

{¶ 39} Regarding the "adversity" element, the Zimmers argue on appeal that Dane's construction of the wall and use of the path was permissive, under color of recorded easement, and, therefore, cannot be adverse or hostile. The trial court's September 17, 2013 judgment lacks any analysis of the adversity element, or the remaining elements of Dane's adverse possession claim as it concerns the wall. Accordingly, we decline to consider the Zimmers' argument that Dane's use was permissive. Instead we remand the matter to the trial court so it can conduct a complete analysis of Dane's adverse possession claim with respect to the east wall, subject to our conclusion that it erred in its prior determination that "exclusivity" was lacking.

{¶ 40} Accordingly, we find Dane's first assignment of error well-taken and remand the matter to the trial court for further analysis.

{¶ 41} Given our conclusion as to Dane's first assignment of error, we are unable to reach Dane's second assignment of error concerning whether the Zimmers may control

18.

the circumstances of repairing or replacing the wall, and whether the court properly apportioned the expenses of repair or replacement. The trial court must reconsider this issue after determining Dane's adverse possession claim.

## B. The Scope of Dane's Easement Over the Path

{¶ 42} Despite the express easement reserved by the Rasmussens in the May 1977 deed to the Kolesars for an "[eight-foot] right of way along the westerly lot line of Lot No. 22 for use of the boat harbor," the trial court found that Dane has a prescriptive easement over the eight-foot wide "gravel path for ingress and egress only."[1] In its third assignment of error, Dane complains that the trial court's judgment fails to set forth Dane's permissible uses of the gravel path. It questions whether the trial court's judgment permits the continued use of golf carts over the path or Dane's use of the path for purposes of maintaining the wall and installing and removing the ramps and docks at the beginning and end of the boating season.

{¶ 43} "The grant of an easement includes the grant of all things necessary for the dominant estate to use and enjoy the easement." *Crane Hollow, Inc. v. Marathon Ashland Pipe Line, LLC*, 138 Ohio App. 3d 57, 66, 740 N.E.2d 328 (4th Dist.2000). The easement granted in the deed to the Kolesars reserved access to the pathway "for use of the boat harbor"—not merely for ingress and egress. To use the boat harbor, Dane members must be able to transport equipment to their boats, maintain the dock wall, and

---

[1] It is unclear whether the parties' mistake as to the true location of the Zimmers' lot line played a role in the trial court's determination that Dane acquired a prescriptive easement, instead of merely acknowledging the express easement contained in the deed.

19.

install and remove the ramps and docks as the seasons dictate. This would mean that Dane may use the path for these purposes. So long as they remain within the eight-foot path, there is no language in the easement that would prohibit the use of golf carts consistent with these purposes. To the extent that the trial court's judgment implies otherwise, it is in error and should be amended. This is consistent with our decision in *Shikner v. Stewart,* 6th Dist. Ottawa No. OT-09-015, 2010-Ohio-1478, ¶ 24, 28, where we concluded that an easement granted for "ingress, egress, and lake access," entitled the holder of the easement to vehicular and boat access on the right-of-way because such access was necessary to the reasonable and proper enjoyment of the purpose of the grant of the easement.

{¶ 44} We find Dane's third assignment of error well-taken and we remand the matter to the trial court to substitute "for use of the boat harbor" for "for ingress and egress only," as currently specified in the trial court's September 17, 2013 judgment entry.

### C. The Dane Avenue Turnaround

{¶ 45} In its judgment entry, the trial court "enjoined [Dane] from blocking the turnaround or in any way interfering with the Defendants' use of the turnaround as such." Dane's fourth assignment of error raises concern over whether the trial court's judgment prohibits it from using the perimeter of the turnaround for storage purposes as it has used the property over the years.

20.

{¶ 46} The Zimmers essentially argue that the easement granting them use of the turnaround encompasses more than just the paved portion of Dane Avenue, therefore, it is insufficient for Dane to keep merely the paved area unobstructed—it must keep the entire turnaround area free of obstructions. But the Zimmers presented nothing at trial to indicate that Dane's storage of boats and trailers around the perimeter of the turnaround impedes their ability to use that area as a turnaround. Because no evidence was presented to suggest that Dane's storage of equipment is currently interfering with the Zimmers' use of the turnaround, we do not read the trial court's judgment to prohibit Dane from continuing to use that area for storage or to create any new obligation on Dane's part. It must merely ensure that the Zimmers continue to be able to use the turnaround area for that purpose.

{¶ 47} We find Dane's fourth assignment of error not well-taken.

### III. Conclusion

{¶ 48} Because we find that the trial court erred in concluding that Dane lacked exclusive possession of the wall and that it failed to consider the remaining elements of Dane's adverse possession claim as it pertains to the wall, we find Dane's first assignment of error well-taken. Given this conclusion, we are unable to reach Dane's second assignment of error.

{¶ 49} We find Dane's third assignment of error well-taken insofar as the trial court's judgment limited Dane's use of the eight-foot prescriptive easement in a manner inconsistent with its established use of the property. To the extent that we find that the

21.

trial court's judgment places no additional duties or obligations on Dane with respect to its storage of equipment on the Dane Avenue turnaround, we find Dane's fourth assignment of error not well-taken.

{¶ 50} We reverse, in part, and affirm, in part, the September 17, 2013 judgment of the Ottawa County Court of Common Pleas. We remand the matter to the trial court for proceedings consistent with this decision. Pursuant to App.R. 24, court costs of this appeal are to be equally divided between the parties.

Judgment reversed, in part,<br>
and affirmed, in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.                                _____
                                                            JUDGE
Stephen A. Yarbrough, P.J.      

                                                          _____
James D. Jensen, J.                                            JUDGE
CONCUR.

                                                            _____
                                                            JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.sconet.state.oh.us/rod/newpdf/?source=6.